EAST TENNESSEE, V. & G. RY. CO. et al. v. INTERSTATE COMMERCE
COMMISSION.

(Circuit Court of Appeals, Sixth Circuit. November 13, 1899.)

No. 595.

1. CARRIERS—INTERSTATE COMMERCE LAW—COMPETITION IN RATES.

Where it is shown that local freight rates by rail from points on the Ohio river to Nashville are such that practically no local freight is shipped between such points by water, it cannot be claimed that railroad rates between the same points on through freight from the Eastern Seaboard, 33⅓ per cent. below the local rates, are forced by the potential water competition.

2. SAME—DISCRIMINATING RATES.

The mere fact that a lower competitive rate exists at a more distant point than at an intermediate point on the same line of shipment, while a fact to be considered, does not itself constitute such a dissimilarity of conditions as will relieve the carrier from the restraints of the third and fourth sections of the interstate commerce law, and justify a higher charge to the intermediate point, but the character of the competition relied on as a justification for the discrimination against the nearer point should also be considered; and, to constitute such justification, it must appear that the discrimination is not arbitrary, but is due to the normal advantages possessed by the more distant point, in the way of more or cheaper facilities for transportation.

3. SAME.

The interstate commerce law was enacted to encourage normal competition, but it is not in accord with the spirit or letter of that law to recognize, as a condition justifying discrimination against one locality, competition at a more distant locality, when competition at the nearer point is stifled or reduced, not by normal restrictions, but by agreement between those who otherwise would be competing carriers. The difference in conditions thus produced is effected by a restraint upon trade and commerce, which is not only violative of the common law, but of the federal anti-trust act.

4. SAME.

Freight rates to Chattanooga from points on the seaboard, fixed by agreement between the different railroads entering the city, which are from 25 to 60 per cent. higher on the different classes of freight than those charged on the same classes over the same route to Nashville, which is 151 miles beyond Chattanooga, are both an unlawful discrimination under section 3 of the interstate commerce law, and a violation of section 4,—it being shown that Chattanooga is a city of manufacturing and commercial importance, having more lines of railroad in actual competition than Nashville, and that there are no other circumstances of substantial advantage in favor of the latter; and an order of the commission forbidding the charging of a higher rate to Chattanooga than to Nashville will be sustained.

5. SAME.

The length of time a discriminating rate has been maintained cannot justify it. It was because time had not corrected abuses of discrimination that the interstate commerce act was passed.

6. SAME—REASONS CLAIMED TO JUSTIFY DISCRIMINATION—POWER OF INTERSTATE COMMERCE COMMISSION AND COURTS TO REVIEW.

While it may be true that traffic managers are better able, by reason of their knowledge and experience, than the courts to fix rates and decide what discriminations are justified by the circumstances, yet this cannot be conceded, so far as it relates to the interstate commerce commission, which, by reason of the experience of its members in this kind of contro-

versy, and their great opportunity for full information. is, in a sense, an expert tribunal. The courts, moreover, are continually called upon to review the work of experts in all branches of business and science, and the intention of congress that they should revise the work of railway-traffic experts, whether railway managers or commerce commissioners, is too clear to admit of dispute.

## Appeal from the Circuit Court of the United States for the Eastern District of Tennessee.

This is an appeal from a decree of the circuit court for the Eastern district of Tennessee (Judge Severens presiding) affirming and enforcing an order of the interstate commerce commission. The cause had its beginning in a complaint of the Board of Trade of Chattanooga, filed with the commission, against a large number of railway and steamship companies engaged in the continuous transportation of merchandise from New York, Boston, Philadelphia, and Baltimore to Chattanooga, and to Nashville and Memphis through Chattanooga. The complaint charged that the defendant companies were injuring the business interests of Chattanooga, which the complainant board of trade was incorporated to represent and protect: (1) By charging freight rates from the Eastern Seaboard points to Chattanooga which were unjust and unreasonably high of themselves, and were thus in violation of the first section of the interstate commerce act; (2) by charging rates to Chattanooga which were higher than those to Nashville and Memphis, and discriminated unduly and unjustly in favor of Nashville and Memphis and against Chattanooga, in violation of the third section of the interstate commerce act: and (3) by charging greater compensation for the transportation of like kinds of property, under substantially similar circumstances and conditions, for the shorter distance from the Eastern Seaboard points to Chattanooga than for the longer distance to Nashville and Memphis, over the same lines, in the same direction,—the shorter being included within the longer distance,—in violation of the fourth section of the interstate commerce act. The companies named in the complaint answered, denying that the Chattanooga rates were unreasonable in themselves, denying that they constituted an undue and unjust discrimination against Chattanooga, and denying that the transportation to Nashville and Memphis was under circumstances and conditions similar to those of the Chattanooga traffic, such as to bring the admittedly greater charge to Chattanooga within the fourth section of the interstate commerce act. The commission heard evidence upon the issues thus raised.

The contention of the defendant companies, foreshadowed in their answers, and more fully developed in the evidence and argument, was that competition at Nashville and Memphis with other steamship and railway lines was so great that the conditions of transportation to the more distant cities were entirely different from those governing the Chattanooga business. Upon this issue, the commission found that the all-water competition by steamer from New York and the other points to New Orleans, and thence by steamboat on the Mississippi river to Memphis, was actual and continuous, and so lowered the possible rates at which the defendant lines could secure any business to that city as to cause the alleged dissimilarity of conditions. The commission therefore held that the complaint as to Memphis rates had not been sustained. As to Nashville, the commission found: First, that the alleged water competition from Ohio river points by the Cumberland river to Nashville had no practical effect upon the through rates from New York and the other Eastern cities to Nashville; and, second, that the defendant companies transporting merchandise through Chattanooga to Nashville did encounter at Nashville a competition on through Eastern business by the east and west trunk lines north of the Ohio river to Cincinnati, and thence by the Louisville & Nashville Railroad to Nashville, and that this competition was not subject to the control of the defendant lines. But the commission held that, as the east and west trunk lines and the Louisville & Nashville Railroad Company were all subject to the interstate commerce law, competition maintained by them did not constitute such a dissimilarity of conditions as to take the case out of the fourth section of the act, and that the only remedy of the defendant companies was to apply

to the commission for relief, under the proviso of the fourth section, by which the commission, upon proper application, is empowered to authorize carriers, in special cases, to charge less rates for the longer than for the shorter distance. Accordingly the commission found that the defendant carriers had violated the fourth section of the act, and made an order requiring the defendant carriers "to cease and-desist from charging or receiving any greater compensation in the aggregate for the transportation of like kind of property from New York, Boston, Philadelphia, Baltimore, or other Atlantic Seaboard cities, for the shorter distance to Chattanooga, than for the longer distance, over the same line, in the same direction, to Nashville." The order was entered December 30, 1892; but its operation was suspended until February 1, 1893, to enable the defendants to apply to 'the commission for special authority, under the proviso of the fourth section, to charge the less rate for the longer distance to Nashville. The commission did not definitely decide that the rates to Chattanooga were unreasonable in and of themselves, and they did not decide whether the competition at Nashville was of such a character that, if application had been made to them, they would have made it a special case, and authorized the less charge for the longer distance, though there are sentences in the opinion of Commissioner Knapp from which it is to be inferred that the commission were inclined to think that the rates to Chattanooga were unreasonably high, in violation of the first section, and that the competition at Nashville would not justify making the case an exception to the general operation of the fourth section. The carriers failed to apply to the commission for relief as suggested in the order, or to comply with the order. Thereupon, on March 24, 1893, the interstate commerce commission filed the petition in equity against the defaulting carriers upon which the decree appealed from is founded. The petition set out, by averments and exhibits, the proceedings before 'it, its findings of fact, its conclusions of law, its order thereon, and the refusal of the defendants to obey, and concluded with a prayer for process, hearing, and enforcement of the order by injunction.

Because of the disqualification of Judge Clark, who had been of counsel, and also because of the pendency of cases in the supreme court, the decision of which it was thought by counsel for both parties would be controlling, the cause did not come on for hearing until December, 1897. Judge Severens decided the case in February, 1898. He held that the commission erred in its view that the defendant carriers were not entitled to rely upon competition of other carriers subject to the interstate commerce law as a condition rendering the fourth section of the act (the long and short haul clause, so called) inoperative without making special application to the commission for relief from its provisions, and thus did not concur in the sole ground upon which the commission expressly based its order. Proceeding to review the whole body of the evidence, however, he found that the competition at Nashville did not render the conditions and circumstances under which defendant carriers conducted transportation thither so unlike those existing at Chattanooga as to take the case out of the long and short haul clause, and that, even if the contention of counsel for the carriers that any real dissimilarity, however slight, in conditions of transportation, took the case out of the fourth section, could be sustained, the discrimination against Chattanooga in the existing rates was so great as to be undue and unjust, within the third section of the act. He therefore concluded that the order of the commission was a proper one on other grounds than that upon which it was based, and entered a decree enjoining the carriers in accordance with its terms. He intimated in his opinion that there was sufficient evidence to sustain a finding that the Chattanooga rates were unreasonably high in and of themselves, but he deemed it sufficient merely to enforce the order of the commission as drawn.

The evidence shows that merchandise consigned from New York and other Eastern Seaboard points (and for the purposes of this case it will hereafter be sufficient to instance the typical case of New York) to Nashville is shipped by a great many different lines, but they are of two classes. One class is made up of east and west trunk lines (so called) lying north of the Ohio river to Cincinnati, and of the Louisville & Nashville Railroad to Nashville. The other is made up of a line, either all rail or by water, to a point in Southern territory, i. e. in Virginia or further south, near or on the seaboard, and thence-

by the Southern lines to Chattanooga, and thence by the Nashville, Chattanooga & St. Louis Railroad to Nashville. The business of the east and west trunk lines north of the Ohio river is so great that the rates of freight in force on them are generally much lower (perhaps 33⅓ per cent.) than those in force on the Southern lines, which embrace, generally, all lines in states south of the Ohio and east of the Mississippi. The Louisville & Nashville Railway Company, though a Southern line, has put in force from Cincinnati to Nashville, a distance of 295 miles, the trunk-line rates, so that freight rates on merchandise coming to Nashville, by way of Cincinnati, are substantially less than they would be were the usual Southern rates of freight charged from Cincinnati to Nashville. Of the Southern lines from New York to Nashville, the chief ones are the ocean lines, either to Norfolk, to Charleston, to Savannah, and to Brunswick, and thence by rail through Chattanooga to Nashville, or the all-rail lines to Hagerstown, Maryland, and Alexandria, Maryland, and thence by the Southern Railway through Chattanooga to Nashville. Eighty per cent. of these all-rail lines are in Southern territory, and all the railroads connecting with the Southern steamship lines are also in Southern territory. If Southern rates on Nashville business were charged on that part of the through lines lying in Southern territory, the total freight rate to Nashville would be much higher than that charged via the trunk lines to Cincinnati, and via the Louisville & Nashville road to the same point. Therefore the Southern lines reduce their charges to such a figure that the total rate becomes the same at Nashville by the Southern lines through Chattanooga, as by the Louisville & Nashville road from Cincinnati and New York. As a result, more than 50 per cent. of the through Eastern business to Nashville is carried over the Southern lines. The Southern lines, however, maintain the Southern rates to Chattanooga.

Chattanooga is 330 miles from Cincinnati, with which it is connected by the Cincinnati Southern Railway, under lease to the Cincinnati, New Orleans & Texas Pacific Railway Company. The latter company does not charge east and west trunk-line rates on through business from New York to Chattanooga, but fixes its rates according to the Southern tariff, though they are less than local rates; and in this way Chattanooga rates, from the East through Cincinnati, are maintained on a Southern basis. The rates in the South at Chattanooga and elsewhere are fixed or agreed upon by the Southern lines through an association known at different times by different names,—at one time as the Southern Railway & Steamship Association, at another as the Southern States Freight Association, and now the Southeastern Freight Association. The association has pursued the policy of grouping towns for the same through rate from the Eastern Seaboard. Chattanooga is for this purpose grouped with many cities to the south. As to this the commission made the following finding:

"As appears from tariffs on file with the commission, the following cities and towns, among others, are grouped with Chattanooga, and take the same rail and water rates on classified traffic, to wit: Dalton, Rome, Atlanta, Americus, Athens, Columbus, Ft. Gaines, and Griffin, in the state of Georgia; Huntsville, Decatur, Sheffield, Tuscumbia, Florence, Gadsden, Oxford, Talladega, Anniston, Birmingham, Opelika, Montgomery, Selma, and Eufaula, in the state of Alabama; and Enterprise and Meridian, in the state of Mississippi. Of these, Dalton, Rome, Atlanta, Americus, Athens, Columbus, Griffin, Anniston, Gadsden, Oxford, Opelika, and Eufaula have higher all-rail class rates than Chattanooga, their all-rail rates on the six numbered classes being as follows:

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| 122 | 104 | 91 | 77 | 63 | 51 |

"The rates to Chattanooga and the above-named common points, both rail and water and all rail, are established by the Southern Railway & Steamship Association, of which the defendant lines herein are members, and all traffic to those points is governed by the classification of that association."

The grouping is illustrated by the following sketch taken from the brief of counsel for the carriers:

. With this explanation of the way in which the differing rates have come to be fixed, it is proper to make a definite statement of exactly what the differing rates are, and their effect. For transportation and rate fixing, merchandise is classified. There are six classes. The Southern classifications differ some-what from the trunk-line or official classification, but the differences are not great enough to be material in this discussion. The commission found as follows:

"The following are the through rates from New York and Boston to Chattanooga, Nashville, and Memphis, respectively:

| Classes | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| To Chattanooga | 114 | 98 | 86 | 73 | 60 | 49 |
| To Memphis, 310 miles further | 100 | 85 | 65 | 45 | 38 | 35 |
| To Nashville, 151 miles further | 91 | 78 | 60 | 42 | 36 | 31 |

"It thus appears that the rates from New York and Boston are less to Nashville than to Chattanooga, on the six classes, respectively, by 23 cents, 20 cents, 26 cents, 24 cents, and 18 cents; and less to Memphis than to Chattanooga by 14 cents, 13 cents, 21 cents, 28 cents, 22 cents, and 14 cents. These differences prevail in favor of Nashville and Memphis on all goods transported to those cities from Eastern Seaboard points through Chattanooga; the distance to Nashville being 151 miles, and to Memphis 310 miles, further than to Chattanooga. * * *

"The following comparison shows the difference between the local rate from Cincinnati to Nashville, and the amounts added to the trunk-line rate to the former place to make the through rate to the latter from New York:

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Local rate, Cincinnati to Nashville | 53 | 48 | 39 | 31 | 25 | 25 |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| Additions to trunk-line rate to Cincinnati | 26 | 21 | 16 | 12 | 10 | 9 |

"A similar comparison between the local rate from Cincinnati to Chattanooga, and the amounts added to the trunk-line rates to Cincinnati to make the through rate from New York to Chattanooga, is shown in the following table:

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Local rates, Cincinnati to Chattanooga | 76 | 65 | 57 | 47 | 40 | 30 |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| Additions to trunk-line rates to Cincinnati | 49 | 41 | 42 | 43 | 34 | 27 |

"The proportion of the Nashville through rate charged on a ton of first-class goods from Cincinnati to Nashville via the Louisville & Nashville Railroad, a distance of 295 miles, is $5.20, while the proportion of the Chattanooga through rate charged from Cincinnati to Chattanooga via the Cincinnati Southern Railway, a distance of 335 miles (only 40 miles further), is $9.80."

The distances by various routes from New York to Nashville and Chattanooga are shown below:

|  | Miles. |
|---|---|
| New York to Cincinnati | 757 |
| Cincinnati to Nashville | 295 |
|  | 1,052 |
| New York to Cincinnati | 757 |
| Cincinnati to Chattanooga | 335 |
|  | 1,092 |

Via Southern lines, all rail:

|  | |
|---|---|
| New York to Bristol | 659 |
| Bristol to Chattanooga | 242 |
|  | 901 |
| Chattanooga to Nashville | 152 |
|  | 1,053 |

Distances from Southern ports to Chattanooga:

|  | Miles. |
|---|---|
| Norfolk to Chattanooga | 650 |
| Charleston to Chattanooga | 448 |
| Savannah to Chattanooga | 435 |

The city of Chattanooga is in Southeastern Tennessee, on the river bearing the same name as the state. During the last 10 years, especially, its growth has been extremely rapid, and it has become a manufacturing and commercial point of considerable importance. It competes for the trade of the surrounding country largely in the same territory as Nashville. By reason of the disparity in charges on shipments from the East in favor of Nashville, Chattanooga is placed at serious disadvantage in this competition, and its business materially lessened. The tendency of existing rates to these rival towns is to limit the area in which Eastern merchandise can be profitably distributed from Chattanooga, and to impede the growth and prosperity of that city which would naturally result from the development of its wholesale trade. Under the tariffs now in force, goods may be carried from the East through Chattanooga to Nashville, and back through Chattanooga to points south and east, and there sold at lower prices than Chattanooga merchants can sell for; and this appears to have actually occurred in many instances. On a car load of first-class freight, 40,000 pounds, the charges to Chattanooga, at $1.14 per 100, amount to $456; while to Nashville, at 91 cents, the charges are only $364, making a difference of $92 in favor of Nashville, the longer haul by 151 miles. On fourth-class freight the advantage in favor of Nashville is $124 per car, and on sixth-class, $72.

Only two railroads enter Nashville. These are the Louisville & Nashville Railroad, from the north and south, and the Nashville, Chattanooga & St. Louis Railway, from the east and west. The railroads entering the city of Chat-

tanooga are: (1) The Nashville, Chattanooga & St. Louis Railway, which runs from Chattanooga to Nashville and St. Louis. (2) The Memphis & Charleston road, which runs from Chattanooga to Memphis, where it connects with the Mississippi river, and forms a line thence via New Orleans. (3) The Alabama Great Southern road, which runs from Chattanooga to Birmingham, Ala., and Meridian, Miss., connecting with a road entering New Orleans. (4) The Chattanooga Southern Railway, from Chattanooga to Gadsden, where it makes several connections. (5) The Chattanooga, Rome & Columbus road, which runs from Chattanooga to Rome, where it connects with various rail lines running through Atlanta to the South Atlantic ports and on to Carrollton, where it connects with the Central Railroad of Georgia System. (6) The Southern Railway (south of Chattanooga), which runs from Chattanooga via Rome to Atlanta, and there connects with the numerous lines, either all rail or rail and water, via the South Atlantic ports, and the Southern Railway (east of Chattanooga), which runs from Chattanooga via Knoxville to Bristol, and thence forms lines, all rail, through Hagerstown or Alexandria, or rail and water via Norfolk. (7) The Western & Atlantic Railroad, now under lease to the Nashville, Chattanooga & St. Louis Railway Company, which runs from Chattanooga to Atlanta direct. (8) The Cincinnati, New Orleans & Texas Pacific Railway, which runs from Chattanooga to Cincinnati.

The seaboard traffic which is carried .to Nashville through Chattanooga reaches the latter place by several different routes. The most important of these appears to be the East Tennessee, Virginia & Georgia Railway (now the Southern Railway), with its Eastern connections by rail and water. The water portion of this route is by the vessels of the Old Dominion Steamship Company from New York to Norfolk, where they connect with the Norfolk & Western Railroad. which extends to Bristol, Tenn., the Eastern terminus of the East Tennessee, Virginia & Georgia; the rail portion of this route consists of the Pennsylvania System, and possibly other lines, reaching Roanoke, Va., on the main line of the Norfolk & Western, by way of the Shenandoah Valley. All traffic over this route passes through Knoxville, Tenn., the rates to which point are about the same as to Memphis. Another route is by the Clyde Steamship Company to Charleston, connecting at that port with rail lines running through Augusta and Atlanta. A third route is by the Ocean Steamship Company to Savannah, and thence by rail through Macon and Atlanta. A fourth route is by steamer to Brunswick, and thence by Southern Railway to Chattanooga. There is no testimony in the case indicating the relative portion of Nashville traffic via Chattanooga which passes by either of these routes, but the commission found that the greater portion of it went by the all-rail route via Alexandria, Va.

The Louisville & Nashville Railroad Company has not been a member of the associations of lines fixing Southern rates. It owns, however, more than one-half the stock of the Nashville, Chattanooga & St. Louis Railroad Company; which always has been a member of these associations, and it jointly operates the railroad of the Georgia Central Railroad & Banking Company, which is also a member of the association. The Georgia Central Railroad & Banking Company owns all the stock of the Ocean Steamship Company which has also been a member of the associations. The Nashville, Chattanooga & St. Louis Railroad Company. is the only railroad connecting Nashville and Chattanooga. It has under lease the Western & Atlantic Railroad, running from Chattanooga to Atlanta. The railroad of the Georgia Central Railroad & Banking Company under the control of the Louisville & Nashville Railroad Company runs from Atlanta to Savannah. And the steamers of the Ocean Steamship Company run from Savannah to New York and Boston. The officers of the Nashville, Chattanooga & St. Louis Railroad Company, it is stipulated, would testify that the company conducts an independent business, and competes with the Louisville & Nashville Company.

The Cumberland river, from Paducah, Ky., to Nashville, is open for navigation nine months in the year. The only steamboats running on it are three or four in number, and are capable of carrying not more than 300 tons of merchandise each. All goods shipped from Cincinnati to Nashville by river, a distance of 617 miles, are transshipped at Paducah, and this is also true of goods shipped by the same route from Louisville and Evansville. A week is con-

sumed in a round trip from Cincinnati to Nashville by steamboat. It is a two-days trip from Paducah to Nashville. The amount of merchandise carried to Nashville by the Cumberland river from Ohio river points, as compared with that carried by the railroad, is very small; and for 20 years no merchandise shipped from New York by the trunk lines to Nashville has been carried from Ohio river points by the Cumberland river, though rates of freight from those points to Nashville by river are certainly 20 to 25 per cent. less than the rates by rail on through business, and from 40 to 50 per cent. less than the local railway rates for the same distance.

The defendant railroad companies introduced evidence of the traffic managers upon the question of the reasonableness of the existing rates to Nashville and Chattanooga. The uniform evidence was that the Nashville rates were not unreasonably low, and the Chattanooga rates were not unreasonably high. The Nashville rates were said to be remunerative, in the sense that they produced a profit over and above the cost of transportation; and the Chattanooga rates were said to be not unreasonably high, because business was done under them and they were not prohibitory, and, further, because on such rates Chattanooga merchants were able to compete with merchants of the cities and towns south of them with which Chattanooga was grouped. No evidence was introduced to show the value of the property necessarily engaged in the business of transportation on any one line, and there was nothing to show that the rates to Nashville did not pay a profit over and above cost of transportation sufficient to meet fixed charges and produce a dividend. Certain of the traffic experts testified that the motive of the Louisville & Nashville Railroad Company in lowering the rates to Nashville was to enable the Nashville merchants to compete with Louisville and Cincinnati merchants in the territory lying between Nashville and the Ohio river, and the same reason is given in the pleadings of some of the defendants and in the briefs of counsel.

W. A. Henderson and Ed. Baxter, for appellants.

L. A. Shaver, for appellee.

Before HARLAN, Circuit Justice, and TAFT and LURTON, Circuit Judges.

TAFT, Circuit Judge (after stating the facts as above). The defendant carriers transport merchandise from New York to Nashville through Chattanooga at rates ranging from 25 to 60 per cent. less than those charged by the same carriers for transporting merchandise from New York to Chattanooga over the same tracks and in the same trains, although the distance to Chattanooga is 151 miles less than that to Nashville. If the carriage to the two places is under similar circumstances and conditions, then the defendants have violated the fourth section of the interstate commerce act, and the order of the commission and the judge at the circuit should be sustained. It is contended on behalf of the defendants that the circumstances and conditions of their Nashville business are not similar to those of their Chattanooga business, in that at Nashville they encounter competition which they must meet by lowering their rates in order to secure any business at all, while at Chattanooga such competition does not exist. This competition is said to be of two kinds:

First, the potential, but not actual, competition afforded by the situation of Nashville on the Cumberland river, by which it may be reached nine months in the year by steamboat from Evansville and Cincinnati. This gives Nashville water communication with points on the east and west trunk lines whose rates are $33\frac{1}{2}$ per cent. less

than the Southern rates, and thus, it is said, makes it practically a trunk-line point. The evidence does not sustain the claim that in respect to through rates from New York to Nashville via Ohio river points the river competition has any effect whatever. The witnesses for the defendants admit that no through freight from New York to Nashville is ever carried by the Ohio and Cumberland rivers; and this although the rates by river are from 20 to 25 per cent. less than the proportion of the through New York rate to Nashville, collected by the Louisville & Nashville Railroad Company for carriage from Cincinnati to Nashville. But it is said that, if the rate is increased to Nashville so as to make it the same as that to Chattanooga, then the river lines will become formidable competitors of the Louisville & Nashville Railroad Company in the through traffic; and freight experts have been produced by the defendants who vaguely express the opinion that to increase the additions made to the trunk-line rates from New York to Cincinnati by the Louisville & Nashville Railroad Company, for its part of the through carriage to Nashville, would induce river competition on this traffic. There has been presented to us an able argument to show the powerful effect of potential water competition upon railway rates in cases where comparatively a small percentage of the freight is actually carried by water. The effect of the Erie Canal upon grain rates of freight is cited as a significant illustration. We fully concede much of what is contended on this head, but we find it to have little or no application to the case in hand. It appears by the undisputed evidence that the rates of the Louisville & Nashville Railroad from Cincinnati, Louisville, and Evansville have practically destroyed, not only the New York through business by river, but the local river business from those points to Nashville. The total amount of traffic on the Cumberland river to Nashville is so insignificant, as compared with the local traffic to the same place, that it is not worthy of notice. Now, the local railway rates to Nashville from Ohio river points are about 50 per cent. higher than the through rates on New York shipments between the same points. To make the through New York rate to Nashville the same as that to Chattanooga, the Louisville & Nashville Company will not have to charge as much for its part of the carriage as its local rates. If the local rates have reduced river transportation to a minimum, it is clear that any increase on through rates, under which they would still be less than local rates, cannot affect river competition at all. In other words, the margin of possible increase in the through rates, without affecting river competition, includes all the increase in rates required to comply with the order appealed from, even if the carriers elect to bring about the equality enjoined in the order by increasing the Nashville rate to the Chattanooga rate. We may therefore eliminate Cumberland river competition as a factor in reaching our conclusion.

The next question for our consideration is whether the competition of the trunk lines to Cincinnati, and of the Louisville & Nashville Railroad to Nashville, makes the conditions of defendants' traffic at that place different from those at Chattanooga. It is settled

in the case of Interstate Commerce Commission v. Alabama M. R. Co., 168 U. S. 144, 164, 167, 18 Sup. Ct. 45, 42 L. Ed. 414, that competition is one of the most obvious and effective circumstances that make the conditions under which a long and short haul is performed substantially dissimilar; that the mere fact of competition, however, no matter what its extent or character, does not necessarily relieve the carrier from the restraints of the third and fourth sections, but only that these sections are not so stringent and imperative as to exclude consideration of competition in determining dissimilarity of conditions, and that competition may in some cases be such as, having due regard to the interests of the public and the carrier, ought justly to have effect upon the rates. It is then the duty of the commission and the reviewing courts in such cases to consider, not only the extent, but the character, of the competition relied on as a justification for discrimination against the nearer point. It must therefore be relevant to ask why such competition is not also present at the nearer point. If the answer to the question is found in the absence at the nearer point of competing railway lines, of water competition, and of other circumstances naturally creating competition, then the further point may be reasonably held to be merely enjoying in its lower rates its normal advantages, which may and do justly overcome the mere disadvantage of the greater distance of the haul. But when we find that the nearer point has not only the advantage of less haul, but also more railway lines in actual competition, and that there are no other circumstances of substantial advantage in favor of the more distant point, we have a case which the fourth section of the interstate commerce law was passed to meet. It is argued that the fact of competitive lower rates at the more distant point speaks for itself, and that no amount of argument can demonstrate a similarity of condition in the face of such a rate. This is only one of many arguments advanced on behalf of appellants, which, reduced to their last analysis, involve, as a major premise, that the existence of a rate and movement of business under it are a complete justification of it, and foreclose judicial investigation. Such an assumption renders the interstate commerce law nugatory and useless. There are other causes than normal competition that produce discriminatory rates. The interstate commerce law, it is conceded, was intended to encourage normal competition. It forbids pooling for the very purpose of allowing competition to have effect. But it is not in accord with its spirit or letter to recognize, as a condition justifying discrimination against one locality, competition at a more distant locality, when competition at the nearer point is stifled or reduced, not by normal restrictions, but by agreement between those who otherwise would be competing carriers. The difference in conditions thus produced is effected by a restraint upon trade and commerce, which is not only violative of the common law, but of the so-called federal anti-trust act. U. S. v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; U. S. v. Joint Traffic Ass'n, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259; U. S. v. Addyston Pipe & Steel Co., 29 C. C. A. 141, 85 Fed. 271. Certainly such a difference in condi-

tions ought not to justify a difference in rates before the commission or the court.

Chattanooga is 151 miles nearer than Nashville to New York by the Southern and most direct routes. It has at least three through competing Southern lines from New York under different managements. These lines reach Nashville over one road from Chattanooga. Chattanooga is connected with Cincinnati, where the stream of traffic of the east and west trunk lines is reached, by a railroad 335 miles in length. Nashville reaches the same city by a railroad 295 miles in length. So far as the record shows, the conditions of railroad transportation between Cincinnati and Nashville are not substantially different from those between Cincinnati and Chattanooga. Both the Louisville & Nashville and the Cincinnati Southern are Southern roads. The Louisville & Nashville does not encounter as much unrestricted competition at Nashville as the Cincinnati Southern at Chattanooga, for the only other line entering Nashville is the Nashville & Chattanooga Company, of which the Louisville & Nashville Company owns more than one-half the stock. But it is said that the Louisville & Nashville Company is vitally interested in building up Nashville by enabling her merchants to compete with those of cities on the Ohio river. Why should the interest of this company be any greater in Nashville than that of the Cincinnati Southern Railroad in Chattanooga? The difference in the Chattanooga and Nashville rates is to be found in something other than the physical conditions existing at the two cities; for, regarding them alone, there is no reasonable ground for any substantial disparity. The evidence shows that the rates to Chattanooga from Cincinnati and from the Eastern Seaboard have always been fixed and agreed upon by an association of the Southern railway and steamship companies. The Louisville & Nashville Company has not been a member of it, but the Nashville, Chattanooga & St. Louis Company, of which the Louisville & Nashville Company owns a majority of the stock, has always been a member; and so has the Georgia Central Railroad & Banking Company, whose road from Atlanta to Savannah the Louisville & Nashville Company jointly operates. The association has grouped Chattanooga with a large number of towns to the south of it for the same rates, and all the members of the association make their rates to Chattanooga accordingly. The Cincinnati, New Orleans & Texas Pacific Railway has been a member of this association, and it is the agreement between it and the other lines at Chattanooga which has prevented the lowering of its New York rate. Without such an agreement, it is not possible to see why normal competition would not give Chattanooga substantially the same rates as Nashville. The result of the agreement is to deny to Chattanooga the natural advantage which direct connection with Cincinnati secures to Nashville, and ought to secure to Chattanooga. The agreement is more than a mere tacit understanding resulting from a praiseworthy desire to avoid rate wars and the carriage of goods at less than cost; for the rates to Nashville are admitted to pay a profit over the cost of transportation, and they are from 25 per cent. to 50 per cent. less than the

Chattanooga rate for a considerably longer haul, with no apparent difference in conditions. We do not perceive that the fact that the competition at Nashville existed before the defendants began to carry merchandise by the Southern route has any material bearing on the issue. It only shows that the cost of transportation on the Southern lines was more slowly reduced than on the Northern lines, but it does not affect the existing situation. It is not important to inquire into the motive actuating the Cincinnati, New Orleans & Texas Pacific Railway Company in its acquiescence in the Chattanooga rate agreement, though its greater or less dependence on the great Southern railway systems for its north-bound business readily suggests itself as a reason for its willingness to hold up its rates, and to refuse to Chattanooga what normal competition would give her. Nor can it be said that the Louisville & Nashville Company, whose fostering care of Nashville is insisted upon in the evidence and briefs for defendants, and is offered as a motive for its low rates to Nashville, is not a party to the plan by which Chattanooga is prevented from enjoying the natural traffic advantages which her railroads and her situation ought to give her; for through its ownership of a majority of the stock of the Nashville, Chattanooga & St. Louis Railway Company, operating a road from Nashville through Chattanooga to Atlanta, its joint operation of the railroad of the Georgia Central Railroad & Banking Company from Atlanta to Savannah in connection with the Ocean Steamship Company, of which the Georgia Central Company owns all the stock, it is very largely interested in traffic from the Eastern Seaboard to Chattanooga, and through Chattanooga to Nashville, and necessarily exercises an influence in shaping the action of the Southern Traffic Association in fixing rates. By its consent to the discrimination against Chattanooga, it only furthers its purpose to favor Nashville; for it enables Nashville merchants to undersell those of Chattanooga to the north and west of that city. We know that it is stipulated in the record that the officers of the Nashville, Chattanooga & St. Louis Railway Company would testify that it competes with the Louisville & Nashville Railroad Company, and that they are under different managements; but such evidence must be weighed in the light of the history of railroads in this country, and the motives that ordinarily govern in railroad management. One railroad company acquires the controlling interest in another company to control its general policy; and, while it may permit independence in the personnel and the details of management, it needs more than a stipulated statement of this general nature to induce a belief that the company which elects the directors of the other will permit that other to take a course materially detrimental to the interests of the owning company.

We are pressed with the argument that to reduce the rates to Chattanooga will upset the whole Southern schedule of rates, and create the greatest confusion; that for a decade Chattanooga has been grouped with towns to the south and west of her, shown in the diagram; and that her rates have been the key to the Southern situation. The length of time which an abuse has continued does not

justify it. It was because time had not corrected abuses of discrimination that the interstate commerce act was passed. The group in which Chattanooga is placed, shown by the diagram above, puts her on an equality in respect to Eastern rates with towns and cities of much less size and business, and much further removed from the region of trunk-line rates, and with much fewer natural competitive advantages. If taking Chattanooga out of this group and putting it with Nashville requires a readjustment of rates in the South, this is no ground for refusing to do justice to Chattanooga. The truth is that Chattanooga is too advantageously situated with respect to her railway connections to the north and east to be made the first city of importance to bear the heavier burden of Southern rates, when Nashville, her natural competitor, is given Northern rates. The line of division between Northern and Southern rates ought not to be drawn so as to put her to the south of it, if Nashville is to be put to the north of it. And we feel convinced from a close examination of the evidence that, but for the restriction of normal competition by the Southern Traffic Association, her situation would win for her certainly the same rates as Nashville. It may be that the difficulty of readjusting rates on a new basis is what has delayed justice to Chattanooga. It may well be so formidable as to furnish a motive for maintaining an old abuse.

It has been suggested that traffic managers are much better able, by reason of their knowledge and experience, to fix rates, and to decide what discriminations are justified by the circumstances, than courts. This cannot be conceded, so far as it relates to the interstate commerce commission, which, by reason of the experience of its members in this kind of controversy, and their great opportunity for full information, is, in a sense, an expert tribunal; but it is true of the federal court. Nevertheless, courts are continually called upon to review the work of experts in all branches of business and science, and the intention of congress that they should revise the work of railway traffic experts, whether railway managers or commerce commissioners, is too clear to admit of dispute.

We conclude that the defendants are violating the fourth section of the interstate commerce act, in charging a higher rate from New York and other Eastern cities to Chattanooga than to Nashville. The order that enjoined them from doing so is therefore right. The decree of the circuit court affirming the order of the commission is affirmed, with costs.